IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CAMERON ALEXANDER STILES,<br><br>Defendant. | Case No.: 3:24-cr-00004-AN-1<br><br>OPINION AND ORDER |

Defendant Cameron Alexander Stiles is charged with felon in possession of a firearm and ammunition in violation of 18 U.S.C.§§ 922(g)(1) and 924(a)(2). He moves to suppress all evidence discovered as a result of a warrantless search and seizure of his person and vehicle, including ammunition, a Keltec pistol, and a nine-millimeter magazine. An evidentiary hearing was held on August 16, 2024, and oral argument was held on October 4, 2024. For the reasons that follow, the motion is GRANTED.

## LEGAL STANDARD

Warrantless searches and seizures are "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnotes omitted). The government bears the burden of demonstrating that a warrantless search and seizure falls within one of the established exceptions. *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012) (citation omitted). Evidence seized in violation of the Fourth Amendment must be excluded from trial. *United States v. Rosales-Aguilar*, 818 F.3d 965, 969 (9th Cir. 2016) (citing *Terry v. Ohio*, 392 U.S. 1, 12 (1968)).

## BACKGROUND

On December 3, 2023, at around 2:00 a.m., Multnomah County Sheriff's Deputy Jeff Wass came across a blue Chevrolet Trailblazer stopped in the middle of the road on Southeast Stark

Street in Gresham, Oregon.  Mot. to Suppress ("Mot."), ECF [23], at 2; Gov't Ex. 1, at 3.  He encountered defendant standing next to the front passenger door, who informed him that he and the driver of the vehicle, Anna Johnson, had run out of gas.  Mot. 2; Gov't Ex. 1, at 3.  At some point during this encounter Wass used his vehicle to push the stalled Trailblazer into a nearby parking lot while defendant guided the car.  Mot. 2.

At around 2:11 a.m., after the Trailblazer had been moved off the road, Gresham Police Department Officer Carranza, who was wearing a body camera, arrived.  *See* Def. Ex. B.  Unfortunately, no body camera footage exists of the preceding ten minutes, and the parties dispute what occurred during that time.

In his narrative report prepared directly after the incident, Wass wrote that when he encountered defendant in the road, he observed a "glass meth pipe" in plain view in the passenger door pocket.  Gov't Ex. 1 at 3.  Wass later photographed the pipe; in the photo, the pipe is tucked into the door pocket with other objects, and the bulb is covered by a bag.  *See* Gov't Ex. 5.  Wass, a former Drug Enforcement Administration Agent, testified that he observed the pipe from "a couple feet away" and was able to see meth residue in it, although he did not mention the meth residue in his contemporaneous report.  Evidentiary Hr'g Tr. ("Tr."), ECF [35], 13:5-16.  Wass also testified that he saw a knife in the doorway of the Trailblazer.  *Id.* 13:23-14:3.  Two knives were seized that night, and Wass could not recall with certainty which was the one taken from the door pocket, but believed it to be an "almost double-bladed," silver handled knife with a longer edge on one side and a shorter edge on the other side.  *Id.* 15:10-22; *see* Gov't Ex. 6.  Wass could not recall when he seized the second knife, whether before or after taking defendant into custody, but believed it came from defendant's person.  Tr. 28:10-21.  Neither knife is the subject of this motion.

Wass testified that he asked defendant his name "for the purposes of issuing a citation for the violation of methamphetamine."  *Id.* 18:12-13.  Defendant did not have any identification and, Wass wrote in his report, "initially was very hesitant to give" his name, but "eventually" said his name was "Cameron Stiles."  Gov't Ex. 1 at 3; Tr. 18:24-19:1.  Wass testified that he also asked for his date of birth

2

and Stiles stated that it was June 15, 1986. Tr. 19:2-5. Anna Johnson also identified herself, provided her birthdate, and said she had a warrant out of Idaho. Gov't Ex. 1 at 3; Tr. 46:4-14. Wass could not recall whether he asked defendant or Johnson for their name first, and his testimony about how he recorded the information was inconsistent; he first stated he believed he wrote down both names and birthdates in his notepad, then stated he did not have defendant's birthdate in his notebook. Tr. 46:12-47:15, 48:5-7. He later explained that he asked for the names and birthdates while the car was still in the road but wrote them down in his notebook after moving the car to the parking lot. Tr. 48:15-20.

Carranza arrived, exited his vehicle, and approached Wass at about 2:11 a.m. Wass can be heard on the body camera footage explaining that he removed two knives from defendant and that there was a meth pipe, and saying, "I'm just trying to figure out who they are at the moment . . . dude is super shady, doesn't have ID on him . . . I'm trying to figure out who he is, he says his name is Cameron Stiles, I don't know if that name rings a bell to you at all . . . he says he doesn't have a warrant but he doesn't like us very much, I'm pretty sure he's lying about his name man." Def. Ex. 2 ("Video") 2:11:08-2:11:38.

Wass wrote in his report that he had Carranza wait with defendant while he searched defendant's name, and that "[l]ooking through multiple law enforcement databases, I was able to identify him." Gov't Ex. 1 at 3. A printout of the search system shows that at 2:10 a.m. a search was run for a "Cameron Styles" with a date of birth of June 15, 1986. Gov't Ex. 3; Def. Ex. G at 15. Wass explained that he ran the initial search for "Styles" because when he asked defendant for his name, he also asked if his last name was spelled "like the hairstyle," to which defendant responded yes. Tr. 19:11-18. This search did not bring up an exact match but did bring up results with similar names. Def. Ex. G at 15-16. These included a "Carmen Dee Styles," a "Cameron Tremayne Styles," and a "Leslie Carol Styles." Tr. 54:17-55:8. One result was for a "Cameron Alex Moyle Stiles" with a date of birth of August 22, 1992. Wass ran a second search using that name and birthdate at 2:11 am. *Id.* 20:20-24; Gov't Ex. 3; Def. Ex. G at 18. That name brought up a result and basic biographic information, including that defendant was from Burns, Oregon, and Wass later testified that he learned that defendant "had cautions for resisting arrest,

3

possession of weapons, elude and attempt, and also known to carry firearms . . . on felony probation and was DWS misdemeanor." Tr. 21:10-19, 55:23-56:1.

Wass also ran a search for Johnson, inputting the name "Anna Joohnson [*sic*]" with a date of birth of June 15, 1986, the same birthdate he used when searching for defendant. Def. Ex. G at 22. That search also returned multiple results, including one for an "Anna Johnson" with a birthdate of June 15, 1986. *Id.* at 23.

Wass also attempted to identify the ownership of the Trailblazer. Neither defendant nor Johnson had paperwork for the vehicle. Tr. 29:4-5. He wrote in his report that "Johnson stated it belonged to Stiles and Stiles stated it was his mother's vehicle, then told me his mother's name, Robyn Allen, which didn't match his last name." Gov't Ex. 1 at 2. Wass testified that he believed it was "weird" that defendant and his mother did not have the same last name. Tr. 29:4-8. Although not included in his initial report, Wass later testified that he believed the vehicle may be stolen because defendant, who was not driving, could not locate the license and registration; it was late at night; the car was broken down; and the car "was loaded up with a bunch of property." *Id.* 29:4-18. Wass called the dispatcher, who ran the plates and confirmed that the car belonged to a Robyn Allen from Burns, Harney County, Oregon. Def. Ex. E. Throughout the time that Wass ran the names and car, defendant waited and answered Carranza's questions, and Wass testified that at no point did he see defendant make any furtive gestures, try to run away, or try to leave the encounter. Tr. 58:8-21. At one point defendant asked Carranza if the officers could speed up their search because his wife was waiting for him, and Carranza explained that Wass was still identifying him. Video 2:15:02-2:15:21.

Wass wrote in his report that, having questions about the vehicle and "the violation of PCS Methamphetamine," he "decided to detain [defendant] in handcuffs" while he investigated. Gov't Ex. 1 at 3. The body camera footage shows that at about 2:15 a.m. Wass exited the patrol car, approached defendant, and said, "this is what we're gonna do. You've been [unintelligible] with me so far, but you lied to me about your name." Defendant denied lying about his name. The officers grabbed defendant by the arms, tackled him to the ground, and handcuffed him. While being handcuffed, defendant yelled

4

"What are you doing, I didn't lie to you about shit! . . . . My name is Cameron Alexander Moyle Stiles!" Video 2:15:21-2:15:57. Defendant remained adamant throughout the interaction that he provided the correct name and date of birth. While handcuffing defendant, Wass says "I'm detaining you at the moment. Because you lied to me about your name and there's freakin' drug paraphernalia next to me. I could write you a citation for that. So for the purposes of issuing a citation, you're lying to me about your name. That's a crime." *Id.* 2:16:03-2:16:20. Wass did not articulate a concern about the vehicle ownership at any point during the interaction. He later testified that he did not do so because he did not want to "escalate the situation" by activating defendant's fight or flight instinct, so "rather than creating a situation where we have to use force, I was talking about detaining him for something as simple as, like, hey, once we identify you, we'll figure this out." *Id.* 31:19-32:4.

Wass asked for consent to search defendant's pockets. Defendant did not consent to the search. *Id.* 2:16:25-2:16:38. Wass searched defendant's pockets while defendant was handcuffed and face down on the ground. Wass described this as an "inventory search" in his report. Gov't Ex. 1 at 3. While on the ground, Wass asked defendant for his birthdate again, and defendant repeated that his birthdate is August 22, 1992, "exactly what I [already] fuckin' gave you." Video 2:16:40-2:17:17. After the search was completed, the officers lifted defendant off the ground and walked him to the patrol car. Wass can be heard on the body camera footage saying, "walk over here, I'm going to search you a little bit better, okay?" *Id.* 2:17:57-2:18:01. Wass then placed defendant against the side of the patrol car, searched his pockets a second time, and read him his *Miranda* rights. *Id.* 2:18:53-2:19:10. At this point defendant asked to see Wass' notepad to see how he wrote down his name, but Wass declined to show him. *Id.* 2:19:19-2:19:26. Wass did not feel a knife or firearm during the searches. Tr. 61:21-25. He seized two nine-millimeter rounds from defendant's pockets as a result of the search. *Id.* 32:5-13. Wass then placed defendant inside his patrol vehicle.

The body camera footage recorded defendant asking, "just for the record, you're detaining me because I didn't give you the correct name?" Video 2:20:05-2:20:10. Wass responded, "for the record, I'm detaining you because you did not give me a correct name, for the purposes of me issuing a

5

citation for the meth pipe that was in the side there." *Id.* 2:20:12-2:20:24. Prior to this statement, Wass did not indicate that he intended to issue a citation. Wass then asked if defendant had ever been convicted of a crime or if he was a felon. Defendant did not answer. Wass stated that if defendant was a felon he could not possess the knife he seized because it was double-sided. *Id.* 2:21:05-2:21:49. Wass explained that he would call from his patrol car and have the records department run a criminal history search. *Id.* 2:21:16-2:21:18; Tr. 64:1-5. After defendant refused to answer, Wass said, "We'll just do this the hard way" and closed him in the patrol vehicle. Video 2:21:48-2:21:51. Wass subsequently called the records department and asked them to read defendant's criminal history. Tr. 64:11-16.

Wass wrote in his report that, having completed the search and placed defendant in the back seat of his vehicle, and aware of defendant's past felony conviction, he "transitioned [his] investigation to include the unlawful possession of weapons by certain felons." Gov't Ex. 1 at 3. He asked for and received consent to search around the front seats of the Trailblazer. *Id*. Wass found an additional nine-millimeter round in the driver door pocket. Tr. 34:21-25. Wass transported Stiles to the Multnomah County Jail, where staff seized an additional two nine-millimeter rounds from defendant's person. Tr. 37:13-38:4; Gov't Ex. 1 at 3.

Johnson was present throughout the interaction, first near the car and then waiting under the awning at a nearby convenience store, although Wass and Carranza did not question her until after defendant was placed in Wass' patrol car. Johnson also consented to a search of her person. During the search Wass found a blue plastic case in Johnson's jacket pocket that contained two meth pipes with meth residue in them. Gov't Ex. 1 at 3; Tr. 35:11-20; Video 2:24:30-2:24:50; *see* Gov't Ex. 7. Johnson admitted to having meth pipes. Tr. 35:6-9. Johnson explained that Stiles had driven to her house, then asked her to drive him to pick up his wife. Gov't Ex. 1 at 3; Tr. 35:19-24. The body camera footage captures Wass explaining to Johnson that he was going to photograph the meth pipes, but would not charge her, because "if it's just user amounts that's not really a big deal at all." Video 2:25:25-2:25:28, 2:25:55-2:26:00. Johnson was not arrested or charged as a result of the stop.

Wass seized defendant's vehicle and searched it pursuant to a warrant after the arrest.

6

Wass seized defendant's vehicle based on the fact that it "may contain evidence of the crime of ORS 166.270 – Possession of weapons by certain felons," based on the seized ammunition. Gov't Ex. 1 at 3-4. The warrant was granted based on an affidavit that recited the same information in Wass' report. *See* Gov't Ex. 4 at 1-6. That search resulted in the seizure of one nine-millimeter bullet, one rifle ballistic plate, boxes of .22 caliber ammunition, one disassembled Keltec pistol in a case containing instructions on how to assemble it, a bag containing multiple firearm parts, a box of 30.06 rifle ammunition, a debit card belonging to a Betty Dover, and documents addresses to defendant. Gov't Ex. 1 at 8.

## DISCUSSION

### A.     Whether an Arrest or Investigatory Stop Took Place

A police encounter constitutes a seizure under the Fourth Amendment if a reasonable person would not believe they are free to leave—in other words, if "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (internal quotation marks and citations omitted). There is no seizure "when law enforcement officers merely approach an individual in public and ask him if he is willing to answer questions." *United States v. Washington*, 490 F.3d 765, 770 (9th Cir. 2007) (citation omitted).

Although the question of when an encounter becomes a seizure is fact-specific, the Ninth Circuit has identified certain situations where an officer's actions turn an encounter into a seizure, such as "when a law enforcement officer, through coercion, physical force, or a show of authority, in some way restricts the liberty of a person," or "if there is a threatening presence of several officers, a display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Washington*, 490 F.3d at 771 (internal quotation marks and citations omitted).

A seizure can range from a brief investigatory stop to an arrest. In what is commonly referred to as an investigatory stop or a *Terry* stop, if an officer has "reasonable articulable suspicion that a person is engaged in a crime, the officer may briefly detain that person to make a limited and

7

appropriate inquiry," and if the officer "has reason to believe that the person detained may be armed with any sort of weapon, the officer may further conduct a limited protective frisk for such weapons." *United States v. Brown*, 996 F.3d 998, 1001 (9th Cir. 2021) (citing *Terry*, 392 U.S. at 20-21, 27-29). "Reasonable suspicion 'exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for particularized suspicion.'" *United States v. Villasenor*, 608 F.3d 467, 473 (9th Cir. 2010) (emphasis omitted) (quoting *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc)).

The difference between a *Terry* stop and an arrest is "one of degree and is dependent upon the 'totality of the circumstances': specifically, the intrusiveness of the stop, how much the plaintiff's liberty was restricted, and the reasonableness of the methods used by the police officers under the circumstances." *Ward v. Gates*, 52 F. App'x 341, 343 (9th Cir. 2002) (quoting *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir.1996)).  Courts also look at whether "the measures would cause a reasonable person to feel that he or she will not be free to leave after brief questioning—i.e., that indefinite custodial detention is inevitable." *United States v. Guzman-Padilla*, 573 F.3d 865, 884 (9th Cir. 2009) (citation omitted).

It is difficult to determine exactly when the encounter became a seizure because the body camera footage does not begin immediately.  There was presumably no seizure when Wass approached defendant in the road and offered to help him move the car.  By the time Wass and Carranza tackled and handcuffed defendant, there was certainly a seizure.  Based on the evidence available, however, the Court finds that a seizure occurred at the point when defendant and Wass parked the Trailblazer in the parking lot and Wass began investigating defendant's identity.  Wass pulled his patrol car directly behind defendant and his vehicle with his flashing lights on.  He then called for a second officer, Carranza, who approached and questioned defendant.  At one point defendant asked if the officers could speed things up and Carranza did not permit him to leave.  This police conduct would indicate to a reasonable person that they were not free to ignore the police or leave.

The government argues that Wass' seizure was an investigatory stop based on a

reasonable suspicion that the Trailblazer was stolen and that the resulting search was a proper frisk for weapons. Gov't Resp. 12-14. Assuming that the stop was a *Terry* stop, Wass lacked reasonable articulable suspicion that defendant was in the process of stealing or in the possession of a stolen vehicle. The primary basis for Wass' belief that the Trailblazer was stolen was that it was "weird" that defendant had a different last name than his mother, who defendant correctly stated was the owner of the car. It is not reasonable to infer that defendant was lying about the ownership of the car because his mother has a different last name. The fact that the car was broken down late at night and contained luggage also does not support a reasonable basis for a particularized suspicion that the car was stolen.

Whether Wass had reasonable suspicion to investigate a potential vehicle theft is beside the point, however, because the encounter quickly became an arrest, not an investigatory stop. The intrusiveness of the seizure exceeded what would be required to conduct an investigatory stop and frisk. Wass testified that he had concerns about his safety during the encounter: he believed defendant had been "reluctant" to give his name, possessed a knife, and was known to carry weapons and resist arrest. However, at the time Wass and Carranza tackled defendant to the ground and handcuffed him, defendant had been cooperative and compliant for at least fifteen minutes. He had voluntarily permitted Wass to remove the knife from the car, the two had worked as a team to push the Trailblazer out of the road, and defendant waited by the car and answered questions while Wass searched for information about him and the car. He did not once attempt to flee or make any threatening movements. In this context, the sudden escalation to two officers tackling defendant, handcuffing him, searching his pockets multiple times, and placing him in the patrol car, was highly intrusive, significantly restricted defendant's liberty, and was unreasonably excessive for an investigatory stop of a cooperating suspect. *See Lambert*, 98 F.3d at 1188 (internal quotation marks omitted) (quoting *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982)) ("[H]andcuffing substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop."); *Green v. City & Cnty. of S.F.*, 751 F.3d 1039, 1047-48 (9th Cir. 2014) (holding that stop became arrest where arrestee was "compliant with law enforcement at all times," police had no information she was currently armed or that violent crime did occur or would

9

imminently occur, and multiple officers pointed weapons at and handcuffed single arrestee). This finding is further supported by the fact that the officers read defendant his *Miranda* rights after handcuffing him, suggesting they too understood and intended the encounter to be an arrest. While "[t]he Ninth Circuit has also held that placing a suspect in the back of a patrol car does not convert the stop into an arrest where the detention is no longer than necessary for a legitimate investigation," *Garza v. City of Salem*, 690 F. Supp. 3d 1188, 1201 (D. Or. 2023) (citing *Gallegos v. City of Los Angeles*, 308 F.3d 987, 992 (9th Cir. 2002); *Haynie v. Cnty of Los Angeles*, 339 F.3d 1071, 1077 (9th Cir. 2003)), detention was longer than necessary for an investigation here. By the time defendant was placed in the back of the patrol car, Wass had already conducted an investigation and verified defendant's identity and the car ownership. Any time at all in the back of the patrol car was not necessary to conduct an investigation at that point.

B.     **Probable Cause for Arrest**

A warrantless arrest is only justified under the Fourth Amendment when the arresting officer has probable cause that a person has committed or is committing a crime. *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing *Michigan v. Summers*, 452 U.S. 692, 700 (1981)). "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *Id.* (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). To determine whether a police officer had probable cause to conduct a warrantless arrest, "we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (internal quotation marks and citation omitted). Because probable cause is an objective standard, the "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause . . . subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (citation omitted).

The government argues that Wass had three independent bases to establish probable

cause that defendant had committed or was committing a crime: defendant's alleged provision of a false name and date of birth, a violation of Oregon Revised Statute ("ORS") § 162.385; constructive possession of a dirk or dagger with a prior felony conviction in violation of ORS § 166.270(2), and being in violation of the terms of his state probation for the use and constructive possession of a controlled substance pursuant to ORS § 137.545. Gov't Resp. 10-11.

    1.    *False Information*

Wass' stated justification for arresting defendant was that he had provided a false name for purposes of issuing a citation for possession of methamphetamine. Tr. 40:11-19. Wass did not have probable cause to arrest defendant on this basis.

First, it seems unlikely that Wass was able to see any methamphetamine residue in the meth pipe. The pipe was placed with a number of other objects in the passenger door pocket, and the bulb of the pipe, where residue would be likely to be located, as well as about half the pipe tube, were completely covered by a bag. Wass observed this while standing at least a couple of feet away. Wass did not touch the pipe, inspect, it, or photograph it until after the arrest.

Second, Wass never informed defendant that he was going to issue him a citation before asking for his name or at any point before arresting him. Under ORS § 162.385(1)(a), "[a] person commits the crime of giving false information to a peace officer in connection with a citation or warrant if the person knowingly uses or gives a false or fictitious name, address or date of birth to any peace officer" when the officer is "issuing or serving the person a citation under authority of ORS 133.055 to 133.076 or ORS chapter 153." As the plain text of the statute suggests, an officer must have initiated issuing the citation, and the person receiving it must be aware of the citation, to commit the crime of giving false information. Oregon courts have consistently held that this is a requisite element of the crime. *See State v. Ormsby*, 237 Or. App. 26, 29, 238 P.3d 421 (2010) (finding elements of ORS § 162.385 not met where "there was no evidence showing that, when defendant provided a false name to the police officer, defendant knew the officer was requesting information for the purpose of issuing a citation"); *State v. Allen*, 222 Or. App. 71, 77, 191 P.3d 762 (2008) (finding that elements of ORS § 162.385 were not met

11

where officers "were not in the process of issuing a citation to defendant or arresting him on a warrant"); *State v. Jaha*, 118 Or. App. 497, 501, 848 P.2d 622 (1993) (holding that for purposes of ORS § 162.385, defendant must be aware that officer was requesting identification for purpose of issuing a citation). Wass testified that he intended to cite defendant, but an unarticulated intent is not sufficient. In addition, the Court finds it unlikely that Wass intended to cite defendant given that after the arrest was initiated, he told Wass he "could" write him a citation. He also chose not to cite Johnson, who had meth pipes with visible meth residue on her person, because it was "not a big deal." Defendant could not be in violation of ORS § 162.385 at the time of the arrest because Wass had never issued or begun issuing a citation.

       2.      *Double-Edged Knife and State Probation Violation*

ORS § 166.270(2) criminalizes the possession of "any instrument or weapon having a blade that projects or swings into position by force of a spring or by centrifugal force or any blackjack, slungshot, sandclub, sandbag, sap glove, metal knuckles or an Electro-Muscular Disruption Technology device as defined in ORS 165.540, or who carries a dirk, dagger or stiletto" if they have ever been convicted of a felony. The government argues that defendant's double-edged knife would qualify as a "dirk or dagger" and its location in the Trailblazer demonstrates constructive possession. Gov't Resp. 3 n.2 (citing *United States v. Rousseau*, 257 F.3d 925, 931 (9th Cir. 2001) (finding that the defendant constructively possessed a double-edged knife located on the floorboards of the truck he occupied and that officer had probable cause to arrest him for a violation of ORS § 166.270(2))).

The relevant portion of ORS § 137.545 states that "[a]t any time during the probation period, the court may issue a warrant and cause a defendant to be arrested for violating any of the conditions of probation. Any parole and probation officer, police officer or other officer with power of arrest may arrest a probationer without a warrant for violating any condition of probation." Or. Rev. Stat. § 137.545(2). The government argues that Wass had probable cause to arrest defendant because the constructive possession of the meth pipe was a violation of his state probation.

Although Wass testified that the computer printout included information that defendant had a prior felony conviction and was on state court probation for it, he did not appear to be aware of this

12

information at the time of the arrest. He asked defendant whether he had ever been convicted of a crime or felony, and when defendant did not answer, Wass said that they would "do this the hard way" and subsequently called the records department to obtain defendant's prior conviction history. Although the printout may have contained that information, Wass did not seem aware of it prior to or during the arrest. Although probable cause is an objective, not subjective standard, it must take into account what facts the officer knew at the time when determining whether an objectively reasonable officer would have probable cause to arrest. *See Devenpeck*, 543 U.S. at 153. Without knowledge of defendant's prior arrests, an objectively reasonable officer would have no basis to believe that defendant had a prior felony conviction or that he was on state court probation, which are both requisite elements of the constructive possession offenses.

Accordingly, the Court finds that Wass arrested defendant and searched his person without probable cause.

C.    **Exceptions to the Warrant Requirement**

Having established that defendant was arrested and searched without a warrant or probable cause, the Court must find that the search of defendant's person during the arrest was unlawful unless an exception to the Fourth Amendment warrant requirement applies.

1.    *Search Incident to Arrest*

The government asserts that the search of defendant's person that resulted in the seizure of two nine-millimeter rounds was a valid search incident to arrest. Gov't Resp. 11. A search of a person or vehicle incident to arrest is constitutionally permissible when probable cause exists to arrest the person searched. *United States v. Hartz*, 458 F.3d 1011, 1019 (9th Cir. 2006) (citation omitted). Here, probable cause did not exist to arrest defendant, so the search incident to arrest exception does not apply. Defendant explicitly denied consent for the search, so there was no consent to conduct the search. Accordingly, the search of defendant at the time he was handcuffed was unlawful and the ammunition seized from his pockets must be suppressed.

*2.  Inventory Search*

The government argues, in the alternative, that Wass conducted a valid inventory search of defendant because the Multnomah County Sheriff's Office inventory policy requires officers to conduct an inventory of any person placed in handcuffs prior to placing them in a patrol vehicle. Gov't Resp 6 n.8, 14 n.13. The inventory search exception is often invoked in relation to searches of vehicles prior to impoundment. Inventory searches must be done according to standardized criteria and not for the sole purpose of investigation, as their purpose is to protect property, avoid liability for missing items, and protect the police from danger. *United States v. Garay*, 938 F.3d 1108, 1111 (9th Cir. 2019) (citation omitted); *United States v. Wanless*, 882 F.2d 1459, 1463 (9th Cir. 1989) (citation omitted). "[T]he existence of an inventory policy or practice is not itself sufficient to justify applying the inventory-search exception." *United States v. Anderson*, 101 F.4th 586, 593 (9th Cir. 2024) (emphasis omitted).

Here, the government has not provided evidence of the Multnomah County Sheriff Department's inventory policy or explained why it was lawfully invoked at the time defendant was handcuffed. The search was investigatory, to collect evidence that would form the basis of the later search of the car, and does not appear to have been done for the purposes of protecting defendant's property or protecting from danger. Wass did not collect all of defendant's property, as evidenced by the fact that additional property was seized from his person at booking, and the government did not provide an inventory sheet or other evidence of cataloging and storage consistent with an inventory function. The facts of the case show that this was an unlawful investigatory search incident to arrest, not an inventory search.

**D.    Exclusionary Rule**

The search of defendant's pockets was not justified under the Fourth Amendment, and the ammunition seized as a result must be suppressed. Given this finding, the next question is whether the subsequent searches resulting from the ammunition seizure—the consent search of the front of the Trailblazer, the second search of defendant's person while being booked into jail, and the warrant search of the entire Trailblazer—must also be suppressed.

"[U]nder the 'fruits of the poisonous tree' doctrine, evidence obtained subsequent to a violation of the Fourth Amendment is tainted by the illegality and is inadmissible, despite a person's voluntary consent, unless the evidence obtained was 'purged of the primary taint.'" *Washington*, 490 F.3d at 774 (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). The government has the burden of showing that the primary taint has been purged such that the evidence is admissible. *United States v. Ramirez*, 976 F.3d 946, 960 (9th Cir. 2020) (citing *Washington*, 490 F.3d at 777).

1. *Consent Car Search*

After a Fourth Amendment violation, evidence seized as the result of a contemporaneous or subsequent consent search must be suppressed unless the consent was voluntary and "'sufficiently an act of free will to purge the primary taint.'" *Washington*, 490 F.3d at 774 (quoting *Wong Sun*, 371 U.S. at 486, 488). Courts in the Ninth Circuit must consider "'(1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the defendant was notified that she had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained.'" *United States v. Patayan Soriano*, 361 F.3d 494, 502 (9th Cir. 2004) (quoting *United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002)).

Wass stated that he received consent to search the front of the vehicle. The consent to search was received within minutes of an unlawful seizure. Defendant was in custody, handcuffed, held in the back of a patrol vehicle, and surrounded by multiple officers when he granted them permission to search. The officer who sought defendant's consent for the search had, moments prior, tackled defendant to the ground. Defendant had been *Mirandized* prior to the search, and it is not clear from the record whether he was told he had a right not to consent or that a search warrant could be obtained. Under the totality of the circumstances, defendant's consent to search the front of the vehicle was not sufficiently voluntary. The ammunition found as a result of this search must, therefore, also be suppressed.

2. *Warrant Car Search*

Wass seized the Trailblazer and sought a warrant to search it based on his belief that it may contain evidence of ORS § 166.270, possession of weapons by certain felons. This belief was based

on the seizure of ammunition from defendant's person and the front of the Trailblazer, which was not constitutionally permissible.

Under the attenuation doctrine, an intervening event may purge the taint of a Fourth Amendment violation. In determining whether an intervening event has purged the taint, the court looks at three factors: "(1) 'the temporal proximity between the unconstitutional conduct and the discovery of evidence,' (2) 'the presence of intervening circumstances,' and (3) 'the purpose and flagrancy of the official misconduct.'" *United States v. Garcia*, 974 F.3d 1071, 1076 (9th Cir. 2020) (quoting *Utah v. Strieff*, 579 U.S. 232, 239 (2016)).

Under the good faith exception, evidence seized pursuant to a search warrant that is later deemed invalid is still admissible if the officer acted in good faith. However, this exception does not apply "where a search warrant is issued on the basis of evidence obtained as the result of an illegal search." *Wanless*, 882 F.2d at 1466 (citation omitted). Here, the warrant was obtained as a result of the unlawful search and seizure of defendant's person and the front of the Trailblazer. Nothing attenuated the connection between defendant's seizure, the search of the front of the Trailblazer, and the subsequent warrant search of the entire vehicle. The application for the warrant and the full search of the vehicle were the "direct result" of the seized ammunition from the prior unlawful searches. *United States v. Gorman*, 859 F.3d 706, 717 (9th Cir. 2017), *order corrected*, 870 F.3d 963 (9th Cir. 2017). Accordingly, the evidence seized as a result of the search of the Trailblazer must be suppressed.

    3.    *Jail Search*

Defendant was searched again upon booking at the Multnomah County jail. The unlawful seizure of defendant was the immediate, proximate cause of his booking and search, with no intervening circumstances. Accordingly, the items seized during this search must be suppressed.

## CONCLUSION

For the foregoing reasons, defendant's Motion to Suppress Evidence, ECF [23], is GRANTED. The evidence discovered as a result of the search and seizure of defendant's person and vehicle, including but not limited to the ammunition, Keltec pistol, and nine-millimeter magazine, must be suppressed from evidence.

IT IS SO ORDERED.

DATED this 26th day of December, 2024.

_____
Adrienne Nelson
United States District Judge